Filed 5/16/16  Wonderworks Pte. V. Hewlett-Packard CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WONDERWORKS PTE. LTD., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> HEWLETT-PACKARD COMPANY, et. al., <br><br> Defendants and Respondents. | H042330 <br> (Santa Clara County <br> Super. Ct. No. 1-14-CV-273632) |

In this action against Hewlett-Packard Company and two related entities, the court granted defendants' motion to stay the action pending its adjudication in Malaysia. Plaintiff WonderWorks appeals, contending that the doctrine of forum non conveniens should not have been applied, as the public and private interests underlying the litigation did not warrant depriving WonderWorks of its chosen forum.  We agree that on the particular facts before us, the stay constituted an abuse of discretion and requires reversal.

*Background*

The following factual summary is derived from WonderWorks's first amended complaint, supplemented by declarations and accompanying evidence submitted by the parties.  WonderWorks was "incorporated" in Singapore but was wholly owned and managed by Sri Rajan, a California resident.  Defendant Hewlett-Packard Company (HP Co.) was a Delaware corporation with its principal place of business in Palo Alto. Defendant Hewlett-Packard Enterprise Services, LLC (HPES) was a wholly owned subsidiary of HP Co. which identified its principal office as being in Texas; according to

1

WonderWorks, however, Palo Alto was the place where HPES employees conducted "significant business . . . with respect to the subject matter of this case." Like HPES, Hewlett-Packard Malaysia (HPM) was a wholly owned subsidiary of HP Co., incorporated and operating in Malaysia. According to the 2015 complaint, HPES and HPM were agents or, alternatively, alter egos of HP Co., which commingled funds and interchanged employees among the three entities. HP Co. "instructed and controlled" HPES and HPM, using these subsidiaries "as a mere conduit for the affairs of HP Co., including by directing HPES and HPM to carry out the acts alleged in this complaint, for the benefit of HP Co." The complaint referred to the HP entities collectively as "HP."

In late 2009 or early 2010, HPM sought to procure a contract with Bank Negara Malaysia (BNM), the central bank of Malaysia. According to Bee Wah Lim (Lim), the "Country General Manager" of HPM, "BNM was looking for a company to develop an Integrated Statistical System ('ISS') that BNM could use to help manage and monitor the reporting activity and filings made by Malaysian financial institutions and other regulated Malaysian entities." In April 2011, BNM awarded the contract to HPM.

In its complaint WonderWorks alleged that defendants had induced it to join them on a bid for the BNM contract. WonderWorks's role, it was told, would be to sell its software to thousands of businesses in Malaysia that would be required to use the software in filing its financial reports to BNM. According to the complaint, "The Defendants told Plaintiff that after the system was in place in Malaysia, it would be replicated on the cloud for other customers worldwide. Defendants promised Plaintiff extraordinary profits if it would join this venture." WonderWorks spent "millions of dollars" in preparation and then "performed admirably. However, Defendants botched the project and in the end did not pay Plaintiff for most of the work they had contracted to Plaintiff. Defendants also coerced Plaintiff to perform work outside the contract for which they did not pay. Ultimately, Defendants abandoned the project due to their own ineptitude and misconduct in order to cut their own losses, which eliminated the promised

2

sales of Plaintiff's software.  Defendants also told Plaintiff that the worldwide cloud replication that had been promised had not actually been a reality."

WonderWorks elaborated on these allegations by identifying HPM as the entity that had represented that WonderWorks would eventually earn "many millions of dollars in profit" once the BNM system was installed; meanwhile, WonderWorks would be "fully paid for all of its work and [its] software."  HPM had also represented to WonderWorks that "HP would partner with WonderWorks on an exclusive basis to replicate the BNM System on a revolutionary cloud-based system" which could be used by "regulators and reporting entities throughout the world."  HP Co., according to the complaint, "was an integral part of the contractual arrangement with WonderWorks."  HPM assured plaintiff that HP Co. was "committed to funding this Cloud System, and that it was on the agenda of the parent company's highest executives, including CEO Leo Apotheker of HP Co. in Palo Alto, California."  HP Co. and HPES accordingly "approved all material aspects of HPM['s] putting together this deal with Plaintiff for the BNM System, and thereafter monitored and/or managed it closely until . . . HP Co. and HPES employees themselves took direct hands-on control of and/or significantly influenced, reviewed, and approved commercial, legal, risk, and technical aspects of the project."

The eventual agreement between HP and WonderWorks contemplated that WonderWorks would provide its software components and services to the BNM system. HP also agreed to pay license fees for WonderWorks software that was later installed on servers at HP and BNM.  The two components of the integrated agreement were a Statement of Work (SOW) and a "Global Supply Chain Services – Standard Terms and

Conditions for Services and Software" (GSCS).[1]  By July of 2011 HPM began issuing purchase orders that carried their own conditions as well as being subject to the GSCS.

WonderWorks then expended more than $8 million in hiring independent contractor programmers to fulfill its contractual obligations.  After HP obtained WonderWorks's proprietary software specifications and learned how WonderWorks components should be integrated, "HP began to engage in serious misconduct."  Among WonderWorks's allegations were HP's (1) intentionally failing to disclose all of the hardware on which WonderWorks's software had to be installed, resulting in its failure to pay "millions of dollars" in license fees to WonderWorks; (2) failing to pay millions of dollars on invoices submitted by WonderWorks; (3) inducing WonderWorks to continue the work and provide additional licenses while promising to pay the outstanding fees and invoices; (4) forcing WonderWorks to make modifications to components HP had acquired for the BNM system in order to avoid additional fees payable to BNM, even though such modifications were outside the scope of WonderWorks's contract, by threatening to remove WonderWorks from the BNM system and cloud system projects; (5) blaming WonderWorks for HP's own misguided decision to use a faulty, end-of-life component, thereby damaging WonderWorks's reputation and causing its loss of profit; (6) unjustly blaming WonderWorks for HPM's own failure to deliver the BNM system on time; and (7) imposing economic duress on WonderWorks by canceling payments on already approved invoices.  WonderWorks also alleged that HP had led WonderWorks to believe that they would be partners in the worldwide cloud system; yet HP never intended to partner with WonderWorks on the system and failed to fund it.  WonderWorks asserted that "HP's true intent was to obtain [WonderWorks's] expertise, incorporate WonderWorks software into HP's offering for the BNM System without properly

---

[1] The SOW stated that it was an agreement between HPM and WonderWorks, but it also stated that it was "issued by HP in support of HP's [BNM] project."

compensating [WonderWorks], and then to use pretext to expel [WonderWorks] from participation and profit in the BNM System and future Cloud System projects." "Eventually, due to its own incompetence and intentional misconduct and through no fault of [WonderWorks], HP was unable to deliver the BNM System it had contracted to build." HP consequently negotiated an exit agreement with BNM and abandoned the project. WonderWorks, however, at BNM's request, stayed on to support a limited version of the BNM system.

WonderWorks brought this action in November 2014, initially naming only HPES and HPM. In its first amended complaint, filed January 23, 2015, it added HP Co. as a defendant. Against all defendants WonderWorks claimed fraudulent misrepresentation, fraudulent inducement (inducing WonderWorks through misrepresentations to enter into contracts with HP), negligent misrepresentation, and fraudulent concealment with the intent to induce WonderWorks to enter into the contract with HP and then to provide software and services outside the scope of the contract.[2]

WonderWorks further alleged that even if they were not parties to the contracts with HPM (either directly or as HPM's principals), HP Co. and HPES were liable for intentional interference with contractual relations, based on their employees' control of the contractual relationship between HPM and WonderWorks, their interference with WonderWorks's ability to perform, their interference with the payment of WonderWorks for its software and services, and their prevention of WonderWorks's realization of

---

[2] This fourth cause of action alleged concealment of "various material facts, including but not limited to (1) that they did not intend to disclose to BNM that the EAS and XDA components were unsuitable for the BNM System and would need to be replaced, but instead intended to force Plaintiff to design modifications for no additional payment; (2) that they intended to obtain Plaintiff's XBRL software and expertise, and to misappropriate Plaintiff's trade secrets and computer code, and then to exclude Plaintiff from the BNM System project; and (3) that HP intended to eventually negotiate a favorable exit agreement for themselves with BNM, and leave Plaintiff hanging without payment."

5

profits under the contracts with HPM. All defendants were allegedly liable for intentional interference with prospective economic advantage by disrupting WonderWorks's relationship with BNM and the reporting entities to whom WonderWorks supplied software and maintenance services. That disruption consisted in "interference with contract, defamation and commercial disparagement, trade libel, fraud, and other acts . . . ." And HP Co. and HPES were similarly liable to WonderWorks, a third-party beneficiary, based on their intentional interference with contracts between the reporting entities and HPM, which would have benefited WonderWorks through its license and maintenance fees.

In three additional causes of action WonderWorks alleged breach of contract against all defendants for unpaid invoices, unpaid license fees, and the benefits WonderWorks would have obtained as third-party beneficiary of the contracts with the reporting entities. WonderWorks further alleged breach of the covenant of good faith and fair dealing arising from its contracts with HP, negligence in performing under HP's contract with BNM, and "defamation and commercial disparagement" for blaming WonderWorks's software for HP's decision to use and continue using XDA[3] and its "unjustified withholding of important and complete input components from Plaintiff." Finally, WonderWorks asserted quantum meruit against defendants for the "fair and

---

[3] XDA, along with EAS, was a component HP had procured for the BNM system. As WonderWorks described them, both were "end-of-life" software unsupported by the manufacturer, but HP "forced" WonderWorks to modify XDA and EAS so that HP would not have to pay for replacement components. Although WonderWorks advised HP that the modifications would not be suitable for the system, and although the modifications were outside the scope of the parties' agreement, HP threatened to reduce WonderWorks's share of future cloud system revenue and remove it from the BNM and cloud projects. WonderWorks provided the modifications but was not paid for them. Eventually, HP did replace EAS with a WonderWorks software component (for which WonderWorks was not paid), but its decision "to fraudulently conceal an unsupported, end-of-life XDA poses significant known and unknown limitations to the BNM System."

6

reasonable value of the services" WonderWorks had provided "under coercion" by defendants.

In its original complaint naming only HPES and HPM, WonderWorks had asserted that venue was proper in Santa Clara County because it was the principal place of business in California for HPES "and because certain acts and omissions of HPES that are alleged herein occurred in Santa Clara County." WonderWorks further stated that high-level executives of HPES who were involved "with the substance of this case" had business addresses in Palo Alto, the "headquarters" of HP Co.

After receiving the original complaint, HPES and HPM filed their forum non conveniens motion, claiming that California was a "seriously inconvenient forum" with "absolutely no nexus to California." According to its argument, the dispute had "absolutely no connection" to California because it involved "a Singaporean plaintiff (WonderWorks) suing a Malaysian defendant (HP Malaysia) and an out-of-state defendant (HPES) over a contract for delivery of a software system to a Malaysian third-party [*sic*] (Malaysia's central bank, BNM)." Malaysia, on the other hand, had "significant ties" to both the parties and the dispute.

On January 23, 2015, having obtained a continuance of the hearing on HPES and HPM's motion, WonderWorks filed its first amended complaint adding HP Co. as a defendant. WonderWorks asserted that venue was proper in Santa Clara County because HP Co. had its principal place of business there, and because HPES employees conducted "significant business" in Palo Alto, HP Co.'s headquarters. WonderWorks also pointed out that HPES, a wholly owned subsidiary of HP Co., was registered with the California Secretary of State as a foreign corporation qualified to do business within the state.

On January 29, 2015 WonderWorks asked the court to take the motion off calendar without prejudice to its being refiled so that it could be heard with the inclusion of the new defendant, HP Co., which had not yet appeared or declared its willingness to submit to jurisdiction in Malaysia. Counsel for WonderWorks pointed out that the

7

existing motion did not address HP Co.'s role in the events underlying the dispute, and absent an extended hearing date defendants would either initiate piecemeal litigation with its own forum non conveniens motion or address the opposition to the existing motion in its reply—a reply that likely would raise new arguments regarding HP Co. without an opportunity for WonderWorks to respond.

This time a different judge of the superior court, the Honorable William J. Elfving, denied WonderWorks's request to take the forum non conveniens motion off calendar. WonderWorks then filed its opposition to the motion. WonderWorks pointed out that its identity as a Singaporean company was in name only, as it belonged solely to Rajan, a California resident. WonderWorks maintained that it was more convenient to litigate in California because the HP enterprise was based here, Rajan lived here, many of the acts occurred here, and the majority of the important witnesses were in California or elsewhere in the United States, not in Malaysia. Addressing defendants' assertion that the case was only "a Malaysian dispute" between HPM and WonderWorks, WonderWorks responded that HP Co. and HPES were "involved in the BNM project from beginning to end, and their personnel were decision-makers on the project." WonderWorks also pointed out that the three documents that composed the parties' contractual relationship were required by their terms to be read as a single, integrated agreement, and that the term "HP" in these documents was defined to mean HP Co. as well as its subsidiaries (except for the financial terms section).

In their reply defendants insisted that Malaysia, not California, was the appropriate forum, because the dispute arose from a subcontract between HPM and WonderWorks, which pertained to work to be performed for a Malaysian bank and which was governed by Malaysian law. In support of this reply defendants submitted additional declarations from two witnesses, Donn Deffebach of HPES and Lim of HPM. WonderWorks objected on the ground that new facts had been offered in defendants' reply without its having an opportunity to respond. The court did not expressly rule on the objection.

8

The hearing on the motion took place on February 26, 2015. The court filed its decision that day denying the motion to dismiss but granting the alternative request to stay the action pending its adjudication in Malaysia. This appeal followed.

*Discussion*

The doctrine of forum non conveniens is rooted in equity. It allows a court to decline to exercise its jurisdiction over a case when it determines that the case "may be more appropriately and justly tried elsewhere." (*Stangvik v. Shiley Inc*. (1991) 54 Cal.3d 744, 751 (*Stangvik*).) The Legislature sanctioned the application of this principle by enacting Code of Civil Procedure section 410.30, which states, in subdivision (a), "When a court upon motion of a party or its own motion finds that in the interest of substantial justice an action should be heard in a forum outside this state, the court shall stay or dismiss the action in whole or in part on any conditions that may be just." As explained in the Judicial Council's comment to this section, the provision "authorizes a court to decline to exercise its jurisdiction in appropriate instances on the ground that the plaintiff has unfairly or unreasonably invoked the jurisdiction of an inconvenient forum."

Our Supreme Court in *Stangvik* set forth a two-step analysis for a court considering a forum non conveniens motion. The court "must first determine whether the alternate forum is a 'suitable' place for trial. If it is, the next step is to consider the private interests of the litigants and the interests of the public in retaining the action for trial in California. The private interest factors are those that make trial and the enforceability of the ensuing judgment expeditious and relatively inexpensive, such as the ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the availability of compulsory process for attendance of unwilling witnesses. The public interest factors include avoidance of overburdening local courts with congested calendars, protecting the interests of potential jurors so that they are not called upon to decide cases in which the local community has little concern, and weighing the competing interests of California and the alternate jurisdiction in the litigation."

9

(*Stangvik*, *supra*, 54 Cal.3d at p. 751, citing *Piper Aircraft Co. v. Reyno* (1981) 454 U.S. 235, 259-261 (*Piper*) and *Gulf Oil Corp. v. Gilbert* (1947) 330 U.S. 501, 507-509; see also *Morris v. AGFA Corp.* (2006) 144 Cal.App.4th 1452, 1463-1464.)  Also of potential concern is "the interest in trying the case in a forum familiar with the applicable law, and the interest in avoiding unnecessary conflicts of laws."  (*Ravelo Monegro v. Rosa* (9th Cir. 2000) 211 F.3d 509, 512 (*Ravelo Monegro*).)  These public and private interests are to be "applied flexibly, without giving undue emphasis to any one element."  (*Stangvik*, *supra*, at p. 753.)

The burden of proof is on the defendant, as the party asserting forum non conveniens. (*Stangvik*, *supra*, 54 Cal.3d at p. 751.)  On appeal, we review the ultimate ruling for abuse of discretion, and the lower court's ruling is entitled to "substantial deference." (*Ibid*.)  However, the "threshold" determination—the suitability of the alternative forum—is not part of the discretionary balancing of public and private interests but is examined de novo.  (*Id.* at p. 752, fn. 3; *American Cemwood Corp. v. American Home Assurance Co.* (2001) 87 Cal.App.4th 431, 436; *Investors Equity Life Holding Co. v. Schmidt* (2011) 195 Cal.App.4th 1519, 1528.)

1. *Suitability of Malaysia*

WonderWorks does not explicitly address this step of the convenience analysis by asserting that Malaysia is an unsuitable alternative forum.  This suitability determination generally turns on whether the foreign tribunal will exercise personal and subject matter jurisdiction and whether the cause of action will be barred there by its statute of limitations.  (*Piper*, *supra*, 454 U.S. at p. 255, fn. 22; *Stangvik*, *supra*, 54 Cal.3d at p. 752.)  Lead counsel for all three HP defendants represented to the trial court that HP Co. and HPES would consent to jurisdiction in Malaysia and that all defendants would agree to waive any statute of limitations applicable there.  There was no evidence presented that Malaysia would deprive WonderWorks entirely of a remedy.  (See *Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 711 ["The 'no remedy at all' exception . . .

10

applies only in rare circumstances, such as where the alternative forum is a foreign country in which the courts are not independent, or due process is not applied"]; *Shiley Inc. v. Superior Court* (1992) 4 Cal.App.4th 126, 133-134; *Guimei v. General Elec. Co.* (2009) 172 Cal.App.4th 689, 697 (*Guimei*).) We will assume, as do defendants, that WonderWorks has conceded the suitability of Malaysia as an alternative forum.

2. *Balance of Private and Public Interests*

We next consider the trial court's application of the private and public interest factors intrinsic to a forum non conveniens analysis. Unfortunately, neither the court's comments at the hearing nor its ruling gives us a clue to its balancing of the applicable factors. Its order consisted of nothing more than a statement that it had reviewed the parties' written and oral arguments and that the motion was "hereby GRANTED."

"It is the trial court's duty to weigh and interpret evidence and draw reasonable inferences therefrom." (*National Football League v. Fireman's Fund Ins. Co.* (2013) 216 Cal.App.4th 902, 918.) Of course, a trial court need not express its reasons for its ruling on a forum non conveniens motion. "It is axiomatic [that] we review judicial action and not judicial reasoning." (*Cal-State Business Products & Services, Inc. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1676; accord, *Campbell v. Parker-Hannifin Corp.* (1999) 69 Cal.App.4th 1534, 1542.) Our role on appeal begins with the presumption that the lower court "found every fact and drew every reasonable inference necessary to support its determination. [Citation.]" (*Guimei, supra*, 172 Cal.App.4th at p. 699.) We will interfere with a trial court's exercise of discretion only if no judge could reasonably have reached the challenged result. Here, however, in light of all the undisputed material facts, we are compelled to conclude that this criterion has been met.

The most vigorously litigated issue between the parties centered on the degree of deference due WonderWorks as plaintiff. Defendants argued in their motion that "very little deference" should be accorded WonderWorks's choice of forum because this was a dispute strictly between foreign entities with "absolutely no nexus to California." The

11

subcontract with WonderWorks, they urged, was "negotiated in Malaysia between Malaysian and Singaporean entities" and governed by Malaysian law. WonderWorks countered that Rajan, a California resident, was the real party in interest, that the "Hewlett-Packard enterprise" is based in California, and that many of the acts giving rise to its claims occurred here.

The United States Supreme Court has stated that a plaintiff's choice of his home forum should be respected "except upon a clear showing of facts [that] either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems. In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown." (*Koster v*. (*American*) *Lumbermens Mut. Casualty Co*. (1947) 330 U.S. 518, 524.) Ordinarily courts resist disturbing a resident plaintiff's choice of forum, which is presumed to be convenient and "which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." (*Piper*, *supra*, 454 U.S. at p. 255.) "[A] state has a strong interest in assuring its own residents an adequate forum for the redress of grievances." (*Stangvik*, *supra*, 54 Cal.3d at pp. 754-755.)

The "strong presumption" in favor of the plaintiff's choice of forum is of less force, however, and the plaintiff's choice therefore entitled to less deference, in the case of a foreign plaintiff. (*Piper*, *supra*, 454 U.S. at p. 255.) "When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." (*Id*. at pp. 255-256; *Stangvik*, *supra*, 54 Cal.3d at p. 755.)

12

On the other hand, whereas the strong presumption in favor of a resident plaintiff may be weakened by countervailing indications of an oppressive and vexatious purpose, it would be fallacious to conclude that the attenuated presumption in the case of a foreign plaintiff is equivalent to a presumption that the plaintiff chose that forum for those inimical purposes. (See Fromherz, *A Call for Stricter Appellate Review of Decisions on Forum Non Conveniens*, (2012) 11 Wash. U. L.Rev. 527, 535 [charging federal courts with inappropriate "*negative* deference" to foreign plaintiffs by assuming the forum was chosen for an illegitimate reason].) In other words, "less deference is not the same thing as no deference." (*Ravelo Monegro*, *supra*, 211 F.3d at p. 514.) "Because the reason for giving a foreign plaintiff's choice less deference is not xenophobia, but merely a reluctance to assume that the choice is a convenient one, that reluctance can readily be overcome by a strong showing of convenience." (*Lony v. E.I. Du Pont de Nemours & Co.* (3d Cir. 1989) 886 F.2d 628, 634.) A court should therefore examine all relevant factors in determining whether the plaintiff should be permitted to litigate in his or her preferred location, not simply accord that preference no weight at all merely because the plaintiff is based in a foreign country.

One of those relevant circumstances may be a plaintiff's corporate identity. As the Fourth Appellate District, Division Three commented recently, the rule of deference to a corporate plaintiff's forum choice is not applicable in the same way as to human plaintiffs; a corporation may have formed in one state but operates in one or more other states, "which might suggest that *each of those states* could provide a presumptively convenient forum for litigation involving the corporate plaintiff, and each might claim varying degrees of interest in [en]suring that corporation has an adequate forum for redress of its grievances." (*Investors Equity Life Holding Company v. Schmidt* (2015) 233 Cal.App.4th 1363, 1379.) In the case of a *foreign* corporation, it may be considered a " 'pseudoforeign' " corporation if the majority of its shares are held by California residents. (*Id*. at p. 1380.) In such a case, the corporate plaintiff "might have a good

13

claim to whatever forum benefits would be afforded to a similarly situated domestic corporation." (*Ibid.*)

These considerations are equally applicable to plaintiff WonderWorks: While nominally a Singaporean business, it is wholly owned and managed by Rajan, a California resident. The address used during the negotiations was not a physical office but a company that provided registration and other services for companies registered in Singapore.[4] In his declaration Rajan stated that when the original purpose of the registration—to pursue a government grant—fell apart, he abandoned plans to do anything with the entity and eventually returned to the United States. That the sole owner of the plaintiff company lives in and works from California permits the inference that the action is brought here for reasons of convenience, not oppression.

Aside from divergent portrayals of the location of each party's operations, a major source of disagreement was the location of the witnesses, one of the "private interest" factors discussed in the abundant forum non conveniens precedent. WonderWorks named witnesses based in the United States—notably, of course, Rajan, WonderWorks's owner.[5] Defendants relied on witnesses in Malaysia, particularly Lim, who, as "Country General Manager" for HPM, had participated in the negotiations and discussions with WonderWorks regarding its subcontract for the BNM project.

Also a central point of dispute was the difference in the parties' accounts of where the material events took place. According to defendants, the evidence and material witnesses were "practically all in Malaysia," and the "operative time period for resolving this dispute" was "neither the prologue nor the post script [*sic*]. Rather, this dispute turns

---

[4] Counsel compared the registration address as "essentially a local equivalent of a Mailbox[es] Et Cetera."

[5] Rajan also represented that "the few WonderWorks employees who worked on the BNM project are relocating soon and I expect that they will live in California for the next couple of years."

14

on the fundamental question of whether WonderWorks performed its contractual obligations in the Statement of Work ('SOW'), and the extent to which it should receive compensation over and above the originally agreed upon amounts as Plaintiff demands." Thus, defendants argued, any involvement of non-HPM employees was peripheral and "occurred either *before* [HPM] secured the BNM Project and engaged WonderWorks to assist, or *after* the parties' relationship had already deteriorated."

Defendants adhere to this position on appeal. WonderWorks, however, maintains that the scope of the case does indeed encompass the periods before and after the commencement of the work. The first four causes of action, it points out, allege that defendants fraudulently induced WonderWorks to become involved in the BNM project; then, after the contracts were signed, HP made decisions that both impeded WonderWorks's performance and impaired its reputation and economic prospects. HP employees in the United States, WonderWorks alleged, "were intimately involved with both periods," making "critical decisions before, during, and after the work on the BNM project."

In addressing this point of dispute, we consider the location of the acts pertaining to HP's negotiation of the contract with BNM, the recruitment of Rajan for WonderWorks's participation in the BNM project, and the extensive negotiations between Rajan and various HP employees thereafter. In his declaration Rajan stated that Steve Illingworth, an HP employee responsible for selecting contractors for the BNM project, invited him to work on the project through WonderWorks, which Rajan had "no intention of doing anything with" once his government proposal was declined.

WonderWorks also offered a declaration from Illingworth. Until December 31, 2010 Illingworth was employed by HP in Singapore, with responsibility for sales, management, and related business functions for large and strategic accounts in southeast Asia regions such as Malaysia. In his declaration Illingworth stated that he was closely involved in the competitive bidding process for BNM project on behalf of HP. He did

15

not report to employees of HPM but instead to his manager in the United States, Uday Kumaraswami. As a "[l]arge and strategic" deal, the BNM project required "detailed involvement of HP and HPES employees in the United States, including special authorization and approval from senior US executives in HPES, HP Software, and HP from all business units, including finance, legal, risk, delivery, and technology." Many of these United States executives were based in California. Those employees who were part of HPM, such as Lim, interacted "routinely and regularly" by e-mail and telephone regarding the status of the project "and to secure the necessary approvals from several HPES, HP Software, and HP leaders in California." Illingworth's involvement in setting up a competitive bidding position for the BNM project "required extraordinary interactions, direction, authorization, approval, and control by several HPES, HP Software, and HP leaders in California and other US office locations since BNM demanded unlimited liability to be assumed by the awarded vendor." HP's "high level executives" beyond HPM were required to engage in a "high level of involvement and supervision," because project delays or failures were required by BNM to be borne by HP, and "[t]hus, decisions could be approved only by HP headquarters." These executives were the ones who approved the selection of WonderWorks for the BNM project. Illingworth's experience with deals of this size and nature convinced him that executives from those HP entities in California would have continued to be intimately involved with the project, even after Illingworth resigned at the end of 2010.[6]

In addition to Illingworth's declaration, WonderWorks submitted copies of e-mails between Rajan and various HP employees before and during Rajan's work on the project.

---

[6] In her reply declaration, however, Lim stated that the "substantive" work on developing the BNM system was performed by a team of HPM employees overseen and managed by her; once the proposal was submitted to BNM, "no US executives were necessary for authorization or approval nor oversaw or managed the work." WonderWorks's objection to defendants' new evidence encompassed Lim's reply declaration.

16

The terms of the SOW were negotiated in May 2011 with HP's Jose Ignacio Rosales, with other HP employees included in the e-mail correspondence.[7] Eventually Rosales advised Rajan that HP needed to "work internally" and that as soon as he obtained "all the approval," he would e-mail Rajan with the next steps.

In August 2011 Gregory Yurkoski, a Global Software Portfolio Manager for HP in California, was asked to get involved through a "Needs Request" from "SharePointOperations." He had a number of questions about the project and the supplier (i.e., WonderWorks), and his e-mail to Tai at HPM advised her that "management will not approve this to move forward without this information."

By November 2011 delays were compromising the early relationship between the parties. Markus Schneider (located in Germany) had already signed the SOW in June on behalf of HPM, but Rajan had not yet signed. Incorporated into the pending agreement was the "Malaysian Version" of the GSCS. Although a purchase order had already been issued to WonderWorks, the GSCS was delayed in "Global HP Legal." The negotiations over the issues concerning the parties in November 2011 were handled from HP's side by Rajashree Jayaraman, a project director for HPES in Malaysia.

At this point Lim was not directly involved in the negotiations. On November 19, 2011, however, she complained to three employees (Tai, Eric Lim, and Jane Lian) that the completion of HP's agreements with WonderWorks was "very very slow." She suggested that if they did not close within one week, she "would like to escalate this to VP of Global Procurement in the US," and she accordingly urged completion "asap."

One of Rajan's concerns was that the SOW did not protect WonderWorks's source code and that its object code might be reverse-engineered. In December 2011 he

---

[7] These e-mail negotiations involved Puie Yein Chow and Lee Yong Wong in addition to Rosales, with copies of the correspondence sent to Mariah Tai and Betty Lau. Lim was not included as an addressee at this stage.

expressed these concerns to Luann Manning in Global Procurement, who eventually responded that "there is no reverse engineering."[8]

On December 7, 2011, Rajan signed the SOW on behalf of WonderWorks. The accompanying GSCS specified that the agreement "shall be interpreted and governed by the laws of Malaysia." The purchase orders issued to WonderWorks, however, specified that they would be interpreted under and governed by California law. The SOW, the GSCS, and the ensuing purchase orders were all in English.

By mid-2012 increasing tension had developed between Rajan and HP personnel, primarily regarding protection of WonderWorks source code and payment of its invoices. E-mail correspondence attached to Rajan's declaration reflected considerable friction between Rajan and HP executives over these issues. On June 13, 2012, Richard Bahnsen at HP Hong Kong directed Lena Chan at HPM to freeze all WonderWorks invoices because it was "refusing to comply with their obligations under their contract to hand over their relevant source code," which HP had been asking for "for several weeks now." Rajan insisted that "this is just not done" in the industry and that it was not part of the SOW.[9] He expressed additional concern about "illegal licenses now in use by HP" for which HP had not paid, "HP blackmail to WonderWorks, and HP attempted theft of WonderWorks IP."

Rajan complained to Rajesh Narasimhan (at HP in Singapore) of "bullying tactics" about the release of the source code. Narasimhan urged Rajan to talk to Steve McGuinness (HPES in Singapore), who assured Rajan that his team had been reviewing

---

[8] Lim, responding to WonderWorks's list of various HP employees, stated that Manning's "[n]ame is familiar but not sure who she is." Manning's e-mail signature listed a telephone number with a 303 area code.

[9] The phrasing of the request for "source code" was eventually deemed "unfortunate"; the parties' agreement, McGuinness pointed out, was for WonderWorks to provide "Developed Program Source Code."

18

Rajan's allegations and had consulted HP's "Ethics Counsel." When Rajan requested a meeting to discuss outstanding issues, McGuinness asked Deffebach to become involved; McGuinness would "not engage unless instructed" by Deffebach and "the team."

Additional complaints about nonpayment of invoices for software and services provided reached Narasimhan in early August 2012. Narasimhan urged Rajan to work with McGuinness and Deffebach to resolve these issues. It would have been "improper" for Narasimhan himself to "intervene and over rule [*sic*] [Deffebach's] decisions."

By September of 2012, Bahnsen, now at HPM, urged Rajan to meet with him and Deffebach to "sort out" the issues between WonderWorks and HP. Deffebach likewise appealed to Rajan "to engage with HP and specifically with me as the individual responsible, and empowered, to effect a change in the status quo."

Andrew Norton was a "Project" or "Program" director based in Singapore; defendants agreed that he had been involved in the project. In Rajan's declaration, he stated, "[Norton] told me that he interacted with employees of [HP Co.] in the United States who had decision-making authority on WonderWorks contract issues as well as with Donn Deffebach. As problems got worse, Mr. Norton told me that reporting within HP had moved up the management chain and included Kathy Garcia, who he said had ultimate decision-making authority on the BNM project, including authority over project expenses. He also told me that in 2012, Kathy Garcia, a Senior Vice President of [HP Co.], became involved in the project to such an extent that she participated in regular conference calls with team members."

Lim asserted that Garcia had no "substantive involvement" in the BNM Project; she "was not involved in the details nor exerted any authority over the management of the project. Kathy Garcia's role [was] to monitor costs and risk on a global scale for the Enterprise Services business unit." Lim did not believe that Garcia was involved in the review or approval of purchase orders. In e-mail correspondence in May 2012, however, Bahnsen had advised Rajan that purchase order authorization requests were "with Kathy

19

Garcia (she does her approvals on a weekly basis so should see those [purchase orders] come through this week."

Deffebach submitted two declarations describing his own participation in the discussions around the conflict with WonderWorks. He stated that he worked directly with HPM's directors and officers and coordinated his efforts with Lim. He "did not report or otherwise obtain the approval or consent" from anyone in the United States for his work on the BNM project. He also stated that he never interacted with Kathy Garcia of HPES in Texas, as she was not involved in the BNM project. Moreover, he said, no one from any HP entity in the United States participated in communications about the timing of payments to WonderWorks. It was his function to review contracts, costs, revenue, and losses related to the project. Payment decisions were made locally by HPM or, for larger payments, "perhaps sub-regionally."

In Deffebach's second declaration, submitted in February 2015, he explained the disintegration of the BNM project. It was designated a "red account" when it began encountering difficulties. At that point "worldwide senior management in HP Company's Applications & Business Services ('ABS') division of Enterprise Services would be more aware of the account for financial reporting and forecasting purposes." Once an account receives a "red account" designation, the local Country Manager (Lim) would be given assistance from the region. McGuinness and Ruma Balasubramanian became involved after the BNM project had become a red account, but Deffebach led the remediation plan, working under HPM's supervision to "negotiate new terms" between BNM and HPM. In this effort Deffebach reported to "senior level directors and officers of [HPM], including Bee Wah Lim, and senior level management in the Asia Pacific and Japan region, including Mr. McGuinness, Ms. Balasubramanian and Rajesh Narasimhan." Together with Deffebach, they were "the final decision-makers and had full delegated authority with respect to the BNM Project, including payment to all of its sub-contractors."

20

Lim had been with HPM for more than 26 years by the time she wrote her first declaration in December 2014. In that document she stated that her team "led the negotiations and discussions with WonderWorks regarding their engagement as a sub-contractor for [HPM] on the BNM Project." Lim said that she "oversaw and supervised all facets of the BNM Project, including our work with sub-contractors, such as WonderWorks." The focus of her declaration was the management, remediation efforts, and eventual "winding down" of the BNM project.

Lim asserted that the HPM employees who had "information about the work and interactions with WonderWorks" were "primarily located" in Malaysia. She also suggested that BNM employees, who she believed were located in Malaysia, would be witnesses in the case. In her second declaration, executed in February 2015, Lim noted that BNM had served HPM with a notice to arbitrate, there being a conflict between them over the transfer of software rights to the bank.

It is apparent from these declarations and the correspondence between the various actors involved in the conflict with WonderWorks that this was not simply an "intrinsically Malaysian dispute" between two foreign parties with "absolutely no nexus to California." Unquestionably, Lim was based in Malaysia at all times during the events of which WonderWorks complained. But other witnesses were located in the United States. WonderWorks's primary witness, of course, Rajan, lives in California. Deffebach was located in Singapore and Malaysia between December 2010 and December 2012, but in December 2013 he moved to Portland, where he was located at the time of his first declaration in December 2014.[10] According to Deffebach, McGuinness also was based in Singapore during the project, but he relocated to HPES in

---

[10] Deffebach also told Rajan in their June 2012 exchange that he was from Portland but was "currently 'on loan' to the [Asia Pacific and Japan] region, based in Singapore . . . for a year or [two].

the United States in May 2013. Rajan believed McGuinness to be located in San Francisco.

Other witnesses' current locations were not part of the evidence supplied in the parties' moving and opposition papers; both Rajan and Lim suggested where they believed numerous named witnesses and other individuals were located, but each disputed the relevance of the names listed by the other. Rajan's list, for example, included Rosales in Mexico, Yurkoski in Palo Alto, Manning in Denver, and Norton in Australia. Rajan believed Bahnsen to be in Hong Kong, while Narasimhan, he thought, was in Singapore. Garcia was acknowledged to be based in the United States—according to HP Co., in Plano, Texas.[11]

In her reply declaration Lim emphasized that it was HPM employees who performed the "substantive work" on the BNM project, including working with WonderWorks "to develop and implement the BNM information system in Malaysia." Only after the project began to encounter "problems," she noted, did executives Deffebach, Bahnsen, McGuinness, Norton, and Narasimhan become involved. But it was those "problems" that formed the basis of several allegations in WonderWorks's complaint; they were not immaterial facts. Less material were the details of the various employees' performance of the contract between HPM and BNM, including those employees who composed Lim's "team." As HP Co. or HPES executives actively participated in the attempted resolution of the conflict with WonderWorks, the timing of their involvement cannot be discounted as "peripheral," as defendants contended. Finally, to the extent that WonderWorks will rely on its software partner on the project,

---

[11] Rajan listed three United States cities in which Garcia might be located: Cupertino, California; Naples, Florida; and Plano, Texas.

UBmatrix, Inc.,**12** it will require testimony from material witnesses from that Redwood City company.

The location of the witnesses *during* the BNM project does not alone compel litigation in Malaysia. Much of the communication concerning the parties' difficulties in implementing the project was conducted by e-mail from various locations. (See Note, *One-Way Ticket Home: The Federal Doctrine Of Forum Non Conveniens And The International Plaintiff* (1991-1992) 77 Cornell L.Rev 650, 677 [noting that advances in technology facilitate litigation in any given forum, thus vitiating assertions of inconvenience].) With the exception of Lim (who, WonderWorks points out, was not shown to be unavailable or unwilling to appear in California), important witnesses *material* to WonderWorks's claims appear to be located in the United States. (See *Carijano v. Occidental Petroleum Corp.* (2011) 643 F.3d 1216, 1231 (*Carijano*) [court should have focused on materiality and importance of witnesses, not the number located in the alternative forum].)**13**

The events from which this action arose also do not compel the conclusion that it concerns only foreign entities with no connection to California. Defendants overemphasize the fact that the project was to be implemented initially for a customer in Malaysia (i.e., BNM), but WonderWorks's claims address issues outside the scope of the HPM-BNM contract. WonderWorks's first four causes of action accused HPM specifically of misrepresenting the benefits WonderWorks could accrue from the BNM project; but upon information and belief it further alleged that senior management of

---

**12** Illingworth, the HP manager who recruited Rajan for the BNM project, explained in his declaration that UBmatrix was the company that had created the XBRL financial reporting standard. When recruited, Rajan had already worked with UBmatrix on the development of XBRL applications.

**13** Defendants make the point that BNM was "the customer" on the project; but they do not show how that fact is material to a determination of the fraud- and contract-related issues.

HP Co. and HPES approved "all material aspects" of the deal between HPM and WonderWorks. (Cf. *Carijano*, *supra*, 643 F.3d at p. 1230 [court erred in focusing on site of contamination injury rather than mental state of defendants whose decisions resulted in the injury].) WonderWorks also pointed out that the GSCS referred to "HP" in most paragraphs as "Hewlett-Packard Company and its Affiliates." The remaining nine causes of action against the three defendants were directed at the conduct that deprived WonderWorks of the expected benefit of its work on the BNM project. The fifth and seventh causes of action (intentional interference with WonderWorks's contractual relations with HPM and with four reporting entities) were directed solely against HP Co. and HPES.

Defendants' emphasis on the location of the evidence likewise does not convince us that the case belongs in Malaysia. If Rajan's and Illingworth's declarations accurately portray the roles of the executives involved in the decisions to recruit WonderWorks— and, later, to stop paying its invoices—then those decisions would have involved individuals from the United States, not just Lim and the HPM team. Lim's description of the personnel involved and their Malaysian locations overemphasizes the nature of the work on the BNM project, while overlooking the essence of the claims pertaining to defendants' conduct toward WonderWorks before and after the project was undertaken. As noted, much of that evidence appears to be in electronic form, further weakening defendants' claim that the necessary documents are located in Malaysia. Defendants' assertion that WonderWorks performed the work from Malaysia and that it continues to do so was supported by no evidence.

*Manu International*, *S.A.*, *v. Avon Products*, *Inc.* (2d Circ. 1981) 641 F.2d 62 (*Manu*) illustrates the necessity of focusing on the causes of action in evaluating the private and public interests at issue. There the plaintiff, a Belgian corporation, sued a New York corporation for fraud, tortious interference with contract, and related wrongs concerning a business operated by Manu's representative in Taiwan. The district court

24

dismissed the action, ruling that Taiwan was the appropriate forum, as Taiwanese law was applicable and there was insufficient local interest in having the case decided in New York.  The appellate court reversed.  The court first noted that in today's enhanced methods of travel and communication the location of witnesses is less significant in evaluating convenience.  (*Id.* at p. 65; see also *Calavo Growers of California v. Belgium* (2d Cir. 1980) 632 F.2d 963, 969 (conc. opn. of Newman, J.) [recognizing "the realities of modern transportation and communications" which may be more efficient and cost-effective than transferring a lawsuit].)  The court recognized that the causes of action did not, as the district court had found, complain of acts occurring in Taiwan, but alleged fraudulent inducement in New York and misrepresentations in London; and some of the significant witnesses resided in New York, Hong Kong, London, and Belgium.  Even if some witnesses were flown to New York for trial, it would be more cost effective than flying "an equal or greater number of individuals to Taiwan, of hiring Taiwanese counsel to defend and of keeping [Avon employees involved in the alleged conduct] away from their positions in New York and London."  (*Manu*, *supra*, at p. 66.)  "Thus, the location of the witnesses is at least as conducive to trial in New York as to trial in Taiwan."  (*Ibid.*)  The court also noted that any problems with translation were likely to be less serious in New York than in Taiwan, as most witnesses spoke English.

Of equal concern to the appellate court in *Manu* was its anticipation of an inadequate opportunity for the plaintiff to have its day in court, given the hardship of traveling to Taiwan, securing counsel there, and obtaining the attendance of witnesses from New York, London, and Belgium.  (*Manu*, *supra*, 641 F.2d 62 at p. 67.)  It would be "almost a perversion of the forum non conveniens doctrine to remit a plaintiff, in the name of expediency, to a forum in which, realistically, it will be unable to bring suit when the defendant would not be genuinely prejudiced by having to defend at home in the plaintiff's chosen forum."  (*Ibid.*)

25

Finally, turning to the public interest factors, the *Manu* court found that neither Taiwan nor New York had any "particular affirmative public interest" in the case, and either one would be burdened by having the case on its docket. Addressing the district court's heavy reliance on the need to apply Taiwanese law to some of the issues, the circuit court acknowledged that this was a relevant fact, but while proof of foreign law may be a burden, "it is not alone enough to push the balance of convenience strongly in favor of the defendant." (*Manu*, *supra*, 641 F.2d 62 at p. 68.) The United States Supreme Court has also reminded courts that the need to apply foreign law "is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate." (*Piper*, *supra*, 454 U.S. at p. 260, fn. 29; see also *Olympic Corp. v. Societe Generale* (2d Cir. 1972) 462 F.2d 376, 379 ["the need to apply foreign law is not in itself a reason to apply the doctrine of *forum non conveniens*"].)

As for the public interests at stake in the case before us, we cannot find a reasonable justification for the court's ruling by either court congestion or lack of community concern for cases of this nature. As discussed above, the allegations of the complaint are directed not solely at HPM and its personnel but against HP entities in the United States, including HP Co.'s headquarters in California. Nor does the record disclose that Malaysia's interests necessarily outweigh those of California, since the principal allegations have to do less with the Malaysian bank than with the conduct of United States-based executives toward a United States citizen and California resident. Defendants suggest that "it strains credulity for WonderWorks to argue that a San Jose jury would have any interest at all in resolving a foreign dispute regarding a financial reporting system provided to a foreign bank." But this position rests on the questionable premises that this is purely a foreign dispute and that the issues are confined to the reporting system the parties were to provide to the bank. We cannot say that California jurors would be uninterested in deciding whether acts of fraud and contract interference

26

took place in this state to the detriment of a California resident, even if his company, the nominal plaintiff, was registered in a foreign country.

Defendants' reliance on the statement in the GSCS that it "shall be interpreted and governed by the laws of Malaysia," overstates the relevance of that document. WonderWorks's claims are not all based on the GSCS and SOW; most, as noted, in fact pertain to events outside the terms of these documents.[14] Accordingly, we cannot accept defendants' assumption that a California court would necessarily require "Malaysian commercial law experts" to help resolve the controversy. Even to the extent that the SOW and GSCS are at issue, defendants made no showing that these documents (which are written in English) are subject to substantive law that is too abstruse for a California jury to understand.

Thus, without reweighing the evidence in the record, we can only conclude that defendants failed to show that the private and public interests at stake necessitated denying WonderWorks its choice of forum. Seeing no evidence of an oppressive or vexatious purpose in bringing the suit here, according "some deference" to the plaintiff, and recognizing that the sole owner of this "pseudoforeign" entity is a California resident, we cannot agree with the superior court's implied determination that WonderWorks has "unfairly or unreasonably invoked the jurisdiction of an inconvenient forum." (Judicial Council of Cal., com., reprinted at 14A West's Ann. Code Civ. Proc. (2004 ed.) foll. § 410.30, p. 486; see *Carijano*, *supra*, 643 F.3d at p. 1229 [concerns about forum shopping are "muted" where plaintiffs' chosen forum is the defendant's home jurisdiction and has "a strong connection to the subject matter of the case"].) The gravamen of the allegations, the nature of the events giving rise to the action, and the location of the material witnesses indicate that the action can be conveniently litigated here. (Cf. *Ravelo*

---

[14] To the extent that the terms of the purchase orders are material and applicable, those documents stated that they would be "interpreted and governed" by California law.

27

*Monegro*, *supra*, 211 F.3d at p. 514 [forum non conveniens does not require plaintiff to choose the "optimal forum" but is "an exceptional tool to be employed sparingly"].)

Accordingly, we find an abuse of discretion in the order staying the action in favor of its adjudication in Malaysia. We express no opinion whatsoever regarding the likely success or failure of this lawsuit. We hold only that defendants failed to meet their burden to overcome the presumption that California is an appropriate forum in which to litigate WonderWorks's claims. In light of this conclusion, it is unnecessary to address WonderWorks's contentions that the trial court erred by denying WonderWorks's request to conduct additional discovery, abused its discretion by failing to allow WonderWorks an opportunity to respond to evidence submitted by defendants in their reply, and abused its discretion by failing to impose conditions on the stay that would have facilitated litigation in Malaysia.

*Disposition*

The order staying the action is reversed.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MIHARA, J.